UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

NOT FOR PUBLICATION

| | |
|---|---|
| GIANFRANCO ARENA<br><br>Plaintiff,<br>v.<br><br>RIVERSOURCE LIFE INS. CO.<br><br>Defendants. | Civil Action No.<br><br>2:16-cv-5063-JLL-SCM<br><br>**OPINION AND ORDER ON DISCOVERY DISPUTE**<br><br>**D.E. 29** |

**Steven C. Mannion**, United States Magistrate Judge.

Before this Court is an informal discovery motion filed via a Joint Dispute Letter on September 18, 2017.[1] This is an action to recover the full face value of a life insurance policy following the decedent's suicide within the two-year exclusion.[2] Plaintiff Gianfranco Arena ("Mr. Arena") seeks to compel further responses to his document requests and interrogatories from Defendant RiverSource Life Insurance Co. ("RiverSource") "concerning the drafting history of its suicide exclusion clauses, its intent and understanding of those clauses and its policies, practices and procedures related to the application of those clauses."[3] RiverSource opposed the motion. The Court heard oral argument on November 17, 2017. For the reasons set forth on the record and herein, Mr. Arena's motion to compel further discovery responses to Requests for Production

---

[1] (ECF Docket Entry No. ("D.E.") 29, Joint Dispute Ltr.). Unless indicated otherwise, the Court will refer to documents by their docket entry number and the page numbers assigned by the Electronic Case Filing System.

[2] (*See generally* D.E. 1-2, Compl.).

[3] (D.E. 29, Joint Dispute Ltr., at 1- 2).

("Requests" or, singly, "Request") Nos. 3, 6, 7, 8, 9, 10, 11, and 12 and to Interrogatories Nos. 2, 3, 5, 7, 8, 9, 10, and 12 is **DENIED**.

I. **BACKGROUND AND PROCEDURAL HISTORY[4]**

The following is a brief summary of the tragic circumstances out of which this case arose. Mr. Gianfranco Arena is the primary beneficiary on two life insurance policies issued by RiverSource on the life of his late wife Christine Arena ("Mrs. Arena").[5] Mrs. Arena applied for the life insurance policies on January 29, 2014.[6] The policies became effective in April 2014[7] and contained the following exclusions:

> The Flexible Premium Adjustable policy: Suicide by the Insured, whether sane or insane, within two years from the policy date is not covered by this policy. In this event, the only amount payable by us to the beneficiary will be the premiums which you have paid, minus any indebtedness and partial surrenders.
>
> The Term Life policy: If the Insured, whether sane or insane, dies by suicide within 2 years from the policy date, our liability is limited to an amount equal to the total premiums paid.[8]

Mrs. Arena hanged herself on April 21, 2015,[9] and died on April 30, 2015, after she was disconnected from life support.[10] Mr. Arena contends that his wife's "death was not intentional…

---

[4] The allegations set forth within the pleadings and motion record are relied upon for purposes of this motion only. The Court has made no findings as to the veracity of the parties' allegations.

[5] (D.E. 1-2, Compl. at ¶ 1).

[6] (D.E. 1-2, Compl., Exhibit D at 106).

[7] (D.E. 1-2, Compl. at ¶ 1).

[8] (D.E. 1-2, Compl. at ¶ 26).

[9] (D.E. 1-2, Compl. at ¶ 3).

[10] (D.E. 1-2, Compl. at ¶ 5).

because" she "was under a medically induced irresistible impulse to harm herself, caused by strong doses" of medications prescribed within the weeks before her death.[11] RiverSource denied recovery of the full value, citing the suicide exclusionary clauses.[12]

## II.     MAGISTRATE JUDGE AUTHORITY

Magistrate judges are authorized to decide any non-dispositive motion designated by the Court.[13] This District specifies that magistrate judges may determine all non-dispositive pre-trial motions which includes discovery motions.[14] Decisions by magistrate judges must be upheld unless "clearly erroneous or contrary to law."[15]

## III.    DISCOVERY STANDARD

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."[16]

---

[11] (D.E. 1-2, Compl. at ¶ 3).

[12] (D.E. 1-2, Compl. at ¶ 2).

[13] 28 U.S.C. § 636(b)(1)(A).

[14] L. Civ. R. 72.1(A)(1); 37.1.

[15] 28 U.S.C. § 636(b)(1)(A).

[16] Fed. R. Civ. P. 26(b)(1)-(2).

3

"Although the scope of discovery under the Federal Rules is broad, this right is not unlimited and may be circumscribed."[17] Discovery is not a fishing expedition.[18]

Parties may serve on any other party a demand to produce any designated documents that are in the possession, custody, or control of another party.[19] Responses must be made to each item or category of documents requested with a production, an objection, or an answer.[20]

Interrogatories are a discovery device designed "to obtain simple facts…" and "can be a simple mode of obtaining the names and addresses of persons having knowledge of pertinent facts, or of securing information about the existence of documentary evidence[.]"[21] "[A] responding party generally is not required to conduct extensive research to answer an interrogatory, [but] … must make a reasonable effort to respond."[22] "If the answer to an interrogatory may be determined by examining…a party's business records…and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by: (1) specifying the records that must be reviewed…and (2) giving the interrogating party a reasonable opportunity to examine…the records[.]"[23]

---

[17] *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999).

[18] *Smith v. Lyons, Doughty & Velduius, P.C.*, 2008 WL 2885887, at *5 (D.N.J. July 23, 2008).

[19] Fed. R. Civ. P. 34(a).

[20] Fed. R. Civ. P. 34(b)(2)(B).

[21] *Erie Ins. Property & Cas. Co. v. Johnson*, 272 F.R.D. 177, 183 (S.D.W.Va. 2010) (quoting Wright, Miller, & Marcus, Federal Practice & Procedure: Civil 3d § 2163).

[22] *Williams v. Acxiom Corp.*, No. 15-8464, 2017 WL 945017, at *2 (D.N.J. Mar. 10, 2017) (citing *Lamon v. Adams*, 2014 WL 309424 at *4 (E.D. Cal. 2014).

[23] Fed. R. Civ. P. 33(d).

Federal courts employ a burden-shifting analysis to resolve discovery disputes. A party seeking to compel discovery bears the initial "burden of showing that the information sought is relevant to the subject matter of the action."[24] If that burden is met, the objecting party "must state with specificity the objection and how it relates to the particular request being opposed[.]"[25] The objecting party "shall use common sense and reason, and hyper-technical, quibbling, or evasive objections will be viewed unfavorably."[26]

## IV. DISCUSSION AND ANALYSIS

Mr. Arena requests an order compelling further responses from RiverSource to discovery requests "concerning the drafting history of its suicide exclusion clauses, its intent and understanding of those clauses and its policies, practices and procedures related to the application of those clauses."[27] (Contrary to Mr. Arena's quixotic statement in the Joint Dispute Letter,[28] there is no such order in place requiring said discovery, as a Joint Discovery Plan submitted by the parties is not an order from the Court.) Mr. Arena bears the initial "burden of showing that the information sought is relevant to the subject matter of the action."[29] Mr. Arena argues that the parties "dispute what the relevant suicide clauses mean."[30]

---

[24] *Caver v. City of Trenton*, 192 F.R.D. 154, 159 (D.N.J. 2000).

[25] *Harding v. Dana Transp., Inc.*, 914 F. Supp. 1084, 1102 (D.N.J. 1996).

[26] *Williams*, 2017 WL 945017, at *2.

[27] (D.E. 29, Joint Dispute Ltr., at 1- 2).

[28] (D.E. 29, Joint Dispute Ltr., at 2).

[29] *Caver*, 192 F.R.D. at 159.

[30] (D.E. 29, Joint Dispute Ltr., at 2).

A. The "Sane or Insane" Clause is Unambiguous, and the Operative Dispute in this Case Concerns the Decedent's Mental State Rather than that Clause

Insurance policies have contained suicide exclusions for well over one hundred years.[31] In 1876, the United States Supreme Court considered the very "sane or insane" phrase at issue in this case, and stated:

> Nothing can be clearer than that the words, 'sane or insane,' were introduced for the purpose of excepting from the operation of the policy any intended self-destruction, whether the insured was of sound mind or in a state of insanity. <u>These words have a precise, definite, well-understood meaning. No one could be misled by them; nor could an expansion of this language more clearly express the intention of the parties</u>.[32]

Many other courts, both state and federal (and including the Third Circuit), have likewise held that the "sane or insane" clause is unambiguous or that its meaning is plain.[33] Even if, as Mr. Arena

---

[31] *See, e.g., Campbell v. Supreme Conclave Improved Order of Heptasophs*, 66 N.J.L. 274, 277, 49 A. 550, 551 (1901) ("In the early life policies, death by suicide was excepted from the liability of the insurer; and in some cases this was expressed to be so, whether the insured was sane or insane at the time of the act.").

[32] *Bigelow v. Berkshire Life Ins. Co.*, 93 U.S. 284, 287 (1876) (emphasis added).

[33] *See, e.g., Johnson v. Metro. Life Ins. Co.*, 404 F.2d 1202, 1204 (3d Cir. 1968) (noting of the "sane or insane" clause that "*on its face that language plainly comprehends* all purposeful self destruction, whether the suicidal intent and conduct shall emanate from a sane mind or a deranged one.") (emphasis added); *Simons v. Equitable Life Assur. Soc. of U.S.*, No. CIV. A. 89-0262, 1989 WL 115224, at *4 (E.D. Pa. Sept. 28, 1989), *aff'd*, 908 F.2d 964 (3d Cir. 1990) ("[P]laintiffs claim that the language of the exclusionary provisions is vague and ambiguous; specifically, the words 'sane' and 'insane.' This Court is unpersuaded…the language of the contract is clear and unambiguous.") (internal quotation marks and citation omitted); *Charney v. Illinois Mut. Life Cas. Co.*, 764 F.2d 1441, 1443 (11th Cir. 1985) ("There is no ambiguity in the instant case."); *Searle v. Allstate Life Ins. Co.*, 38 Cal. 3d 425, 441 (1985) ("[T]he clause limiting the insurer's liability if death results from 'suicide, sane or insane' is unambiguous."); *Nielsen v. Provident Life & Acc. Ins. Co.*, 100 Idaho 223, 226-7 (1979) (upholding summary judgment for the insurance company despite the fact that "[i]in Idaho an insurance contract is to be construed most favorably to the insured" because "*where a word or phrase used in an insurance contract has a settled legal meaning or interpretation*, that meaning or interpretation will be given effect although other interpretations are possible[,]" and referring to the "sane or insane" clause as "the *plain language* of the policy excluding liability.") (emphasis added); *Atkinson v. Life Ins. Co. of*

6

claims, the parties dispute the meaning of the clause, the determination of whether ambiguity exists is a question of law for the court.[34] This Court is compelled to find the phrase unambiguous in the face of holdings to that effect by the United States Supreme Court and the Third Circuit.[35]

Since the exclusionary clause is unambiguous, the operative disagreement in this case, as Mr. Arena recognizes later in the Joint Dispute Letter, is whether the clause applies to the circumstances of Mrs. Arena's death.[36] The Third Circuit case *Johnson* is instructive with regard to this inquiry.[37] *Johnson* held that the "sane or insane" exclusionary clause comprehends someone who committed suicide "purposefully accomplished in accordance with an intention or design conceived by a deranged mind."[38] This means that an insurance company is not liable in a case where a person purposefully kills himself, even if a condition of insanity prevents that person's purposeful action from demonstrating the legal intent required, for example, to be convicted of a felony.[39] However, *Johnson* also acknowledged that insanity could prevent an apparent suicide

---

*Virginia*, 217 Va. 208, 213, 228 S.E.2d 117, 121 (1976) ("The *plain language* of the exclusionary clause comprehends all purposeful self-destruction whether the suicidal act shall emanate from a sane person or one suffering from a mental aberration.") (emphasis added).

[34] *Pittston Co. Ultramar Am. v. Allianz Ins. Co.*, 124 F.3d 508, 520 (3d Cir. 1997).

[35] *See supra* nn. 32-33 and accompanying text.

[36] (D.E. 29, Joint Dispute Ltr., at 4).

[37] *Johnson v. Metro. Life Ins. Co.*, 404 F.2d 1202 (3d Cir. 1968).

[38] *Id.* at 1204.

[39] *See Bigelow*, 93 U.S. at 287 ("Such a man could not commit felony; but, conscious of the physical nature, although not of the criminality, of the act, he could take his own life, with a settled purpose to do so."); *Charney*, 764 F.2d at 1442-43 ("The sole issue before this Court is whether the suicide exclusionary clause does not apply because Dr. Charney's reserpine-induced depression so diminished his mental capacity that he did not have the requisite intent to commit suicide…Plaintiffs have confused felonious intent negated by diminished capacity with the intent to reach an end through a particular means.").

from falling under the exclusionary clause in a situation where an insane person believes he is immortal or "has no comprehension whatever of what he is doing."[40] The dispute in this case, therefore, ultimately turns not on a determination as to the meaning of a routine, long-established clause, but on a question of fact regarding the decedent's mental state. That question is whether Mrs. Arena hanged herself in order to kill herself (even if she was insane while she did so), or whether she hanged herself without any comprehension whatsoever that she was killing herself.

> B. Mr. Arena's Arguments Fail to Establish the Propriety of Extensive Discovery Regarding the Unambiguous Exclusionary Clause

The Court acknowledges Mr. Arena's arguments that "under New Jersey law, courts will consider extrinsic evidence in connection with a breach of contract claim regardless of whether the insurance contract is unambiguous on its face,"[41] and that "courts in this District have compelled discovery concerning the drafting history of the relevant policy language and industry standards and practices adopted by the insurer."[42] However, though Mr. Arena's marshalling of the *Doto*, *Sparks*, *Skelcy*, and *Nestlé* cases demonstrates tenacious lawyering, it nonetheless fails to persuade the Court.

In *Doto*, the Supreme Court of New Jersey noted that it had previously "recognized the importance of construing contracts of insurance to reflect the reasonable expectations of the insured in the face of ambiguous language and phrasing, *and in exceptional circumstances*, when

---

[40] *Johnson*, 404 F.2d at 1204.

[41] (D.E. 29, Joint Dispute Ltr., 2-3) (citing *Doto v. Russo*, 140 N.J. 544, 556 (1995) and *Sparks v. St. Paul Ins. Co.*, 100 N.J. 325 (1985)).

[42] (D.E. 29, Joint Dispute Ltr., 3) (citing *Skelcy v. UnitedHealth Grp., Inc.*, No. 12-1014, 2014 WL 1371785 (D.N.J. Apr. 8, 2014) and *Nestlé Foods Corp. v. Aetna Cas. & Sur. Co.*, No. CIV. 89-1701 (CSF), 1990 WL 191922 (D.N.J. Nov. 13, 1990)).

8

the literal meaning of the policy is plain."[43] Therefore, *Doto* does not stand for the proposition that as a matter of course New Jersey law permits extrinsic evidence even when an insurance contract is unambiguous on its face, though this is the reading that Mr. Arena implies. Rather, *Doto* is support for the notion that "in exceptional circumstances" a court may consider extrinsic evidence with respect to an unambiguous insurance contract.

A number of factors about *Doto* distinguish it from this case. In addition to the "exceptional circumstances" language quoted above, the court noted the "unique facts" presented by the case.[44] Most crucially, the insurance company was equitably estopped from denying coverage because it was not until three years after the accident occurred that the company took the position that the umbrella car insurance policy it issued did not include uninsured and underinsured motorists.[45] The court further emphasized that the insurance company pursued a course of conduct during the renewal of the relevant policy "that would have convinced an objectively reasonable insured to believe that the umbrella policy" covered uninsured and underinsured motorists.[46] In this case, by contrast, RiverSource has maintained a consistent position, which it conveyed five months after Mr. Arena filed his claim for death benefits.[47] Furthermore, there is no allegation that RiverSource acted in a manner which would convince an objectively reasonable insured that RiverSource was of the view that its suicide exclusionary

---

[43] *Doto v. Russo*, 140 N.J. 544, 556, 659 A.2d 1371, 1377 (1995) (emphasis added) (internal citation omitted).

[44] *Id.* at 546.

[45] *Id.* at 560.

[46] *Id.*

[47] (D.E. 1-2, Compl. at ¶¶ 25-26).

9

clause did not comprehend someone who hangs herself due to effects from a medication. Such an allegation is only made more difficult to establish given that the two cases with the most similar facts to those at issue here – including one from this District – held in favor of the life insurance company denying benefits in the context of a suicide arguably caused by a medication.[48]

*Sparks*, a case dealing with malpractice insurance, did not deal with, and never once mentioned, the process of discovery or the drafting history of the relevant insurance contract.[49] Though the court did not find the contract to be ambiguous, it cited another case where "the language in issue, while perhaps not ambiguous, was nevertheless insufficiently clear to justify depriving the insured of her reasonable expectation that coverage would be provided."[50] The court's opinion implied that even though the "claims made" contract at issue may not have been ambiguous in that on close inspection it was only subject to a single interpretation, it was nonetheless hard to understand.[51] The opinion mentions potential extrinsic or parol (though it

---

[48] *See Loper v. Pruco Life Ins. Co.*, No. CIV A 05-CV-2741 WJM, 2006 WL 3333480, at *1-2 (D.N.J. Nov. 15, 2006) (in a dispute over whether a contract with the "sane or insane" exclusion applied, decedent's widower conceded that were it to apply, her cause of action would fail, despite her contention that an "adjustment to his medication may have rendered him insane at the time of his suicide."); *Charney v. Illinois Mut. Life Cas. Co.*, 764 F.2d 1441, 1442-43 (11th Cir. 1985) ("The sole issue before this Court is whether the suicide exclusionary clause does not apply because Dr. Charney's reserpine-induced depression so diminished his mental capacity that he did not have the requisite intent to commit suicide…Plaintiffs have confused felonious intent negated by diminished capacity with the intent to reach an end through a particular means… Nor can plaintiff's theory that the insured's death was directly caused by the reserpine-induced depression succeed. Whatever the effect of the reserpine on the insured, the direct cause of his death was the self-injection of T61 euthanasia solution.").

[49] *See generally Sparks v. St. Paul Ins. Co.*, 100 N.J. 325 (1985).

[50] *Id.* at 336 (discussing *Gerhardt v. Continental Ins. Cos.*, 48 N.J. 291 (1966)).

[51] *Id.* at 339-40 ("We assume that there are vast numbers of professionals covered by 'claims made' policies who are unaware of the basic distinction between their policies and the traditional 'occurrence' policy.").

10

does not use either word) evidence only in a footnote, and to give the opportunity on remand to the defendant insurance company to demonstrate that the plaintiff understood the deal he was making.[52] For these reasons, the *Sparks* case does not speak to a discovery dispute attempting to compel many documents regarding the drafting history of a phrase which is neither ambiguous nor hard to understand.

*Skelcy* also did not address the drafting history of the relevant policy language.[53] The court in *Skelcy* did grant a motion to compel regarding industry practice, but in circumstances that do not bear on this dispute.[54] There, the widow of the decedent sued his health insurance company for delaying coverage for a drug that the decedent's physician had prescribed to treat his lung disease.[55] The decedent's previous insurance company had approved the same drug a year earlier, and the decedent had had success with that prior treatment.[56] The defendant insurance company eventually approved coverage for the drug, but too late, for the decedent died two days after the approval.[57] Given these circumstances, the widow sought discovery into how the defendant insurance company treated similar requests for the relevant drug in the previous five years, and into medical industry standards regarding the relevant treatment.[58] She alleged that the "stated reasons for the initial denial of coverage…were inconsistent with the prior

---

[52] *Id.* at 342 n. 6.

[53] *See generally Skelcy*, 2014 WL 1371785.

[54] *Id.*

[55] *Id.* at *1.

[56] *Id.*

[57] *Id.*

[58] *Id.* at *2.

authorization of the same treatment, inconsistent with the proven efficacy of the treatment, and inconsistent with the terms of coverage in the operative insurance contract."[59] No such inconsistencies are alleged in this case. Additionally, though the *Skelcy* opinion did not provide the precise language of the discovery requests, its summary made clear that they were much more specific than the requests at issue here.[60]

In *Nestlé*, the district court affirmed the magistrate judge's decision, concluding that the defendant insurer "failed to establish that the order issued by the magistrate…was clearly erroneous or contrary to law[.]"[61] In that case, the court did permit Nestlé to discover information regarding the drafting history of the relevant contract.[62] However, that decision does not bear on the dispute at issue here. *Nestlé* dealt with the drafting history regarding certain environmental insurance policies generally, rather than, as here, with the drafting history regarding a single, long-established clause which has been held to be unambiguous by many courts, including the Third Circuit and the United States Supreme Court.[63] In affirming the magistrate judge's decision, the *Nestlé* court held that "[b]ecause the existence of ambiguity in the policies, the admissibility of extrinsic evidence, and the applicable law are issues as yet unresolved…the magistrate correctly determined the drafting history of Liberty Mutual's insurance policies with Nestlé to be relevant and discoverable."[64] In this case, the applicable law

---

[59] *Id.* at *3.

[60] *Id.* at *2.

[61] *Nestlé,* 1990 WL 191922, at *6.

[62] *Id.* at *5.

[63] *See supra* nn. 32-33 and accompanying text.

[64] *Id.*

12

is resolved and there is no ambiguity in the relevant language. Therefore, the precise reasons cited by the district court in *Nestlé* are absent, and the logic of that case is inapplicable.

    C. Requests for Production

With these preliminaries established, the Court now turns to the specific Requests and Interrogatories. Mr. Arena has not carried his burden to demonstrate that Requests Nos. 6, 7, 8, 9, 10, and 11 are relevant to a claim or defense in this action.[65] All of these Requests seek a broad swath of documents relating to the general way in which RiverSource conducts its business.[66] To the extent that some minute, tangential relevance can be established, the requests are far from "proportional to the needs of the case[.]"[67] Nothing in these six Requests limits the requested production to material relevant to Mrs. Arena's agreements with RiverSource. For example, Request No. 6 seeks "[a]ll documents concerning your procedures, policies, practices, rules, regulations, guidelines, standards or agreements relating to the underwriting of life insurance policies and their implementation[,]"[68] while Request No. 7 requests the same "relating to the process of reviewing, investigating and granting or denying death benefits claims or payouts and their implementation."[69] These two Requests alone, taken together, can be read to demand every document RiverSource has ever produced during the conduct of its life insurance business.

---

[65] *Caver*, 192 F.R.D. at 159.

[66] (D.E. 29-2, Joint Dispute Ltr., Exhibit B, at 6-8).

[67] Fed. R. Civ. P. 26(b)(1).

[68] (D.E. 29-2, Joint Dispute Ltr., Exhibit B, at 6).

[69] *Id.*

Therefore, RiverSource's objections that these Requests are overbroad[70] are sustained. Requests Nos. 6-11 seek discovery that is simply not "proportional to the needs of the case[.]"[71]

Unlike Requests Nos. 6-11, Nos. 3 and 12 are limited to the subject matter of this action by the defined term "Policies," which, with respect to the discovery requests at issue, Mr. Arena defined as "the Term Life and Flexible Premium Adjustable life insurance policies executed between Christine Arena and RiverSource in April of 2014, referred to in the Complaint."[72] (However, the definition does go on to enlarge the term in the context of drafting to include "any standardized or template versions of" the policies which were individualized to Mrs. Arena.[73]) Request No. 3 seeks "[a]ll documents concerning the drafting, solicitation and execution of the Policies[,]"[74] while Request No. 12 seeks "[a]ll documents concerning the intent or interpretation of, or any negotiations, drafts or discussions relating to, the suicide exclusion clauses contained in the Policies."[75] RiverSource objected to both Requests for a number of reasons, but subject to its objections to Request No. 3, RiverSource referred Mr. Arena to over a thousand documents that RiverSource produced, "which include all documents related to the issuance of the Policies that are the subject of this action."[76] Mr. Arena has not disputed the veracity of this response and its

---

[70] (D.E. 29-2, Joint Dispute Ltr., Exhibit B, at 6-8).

[71] Fed. R. Civ. P. 26(b)(1).

[72] (D.E. 29-1, Joint Dispute Ltr., Exhibit A, at 10).

[73] *Id.*

[74] (D.E. 29-2, Joint Dispute Ltr., Exhibit B, at 5).

[75] (D.E. 29-2, Joint Dispute Ltr., Exhibit B, at 8).

[76] (D.E. 29-2, Joint Dispute Ltr., Exhibit B, at 5).

related production. To the extent Requests Nos. 3 and 12 seek anything more than "all documents related to the issuance of the Policies that are the subject of this action," for reasons already discussed they seek materials that are not relevant to a claim or defense or not "proportional to the needs of the case[.]"[77]

### D. Interrogatories

Mr. Arena also seeks to compel further responses to Interrogatories Nos. 2, 3, 5, 7, 8, 9, 10, and 12. For the reasons given above with respect to Requests Nos. 6-11, Interrogatories Nos. 7-10 seek materials not relevant to a claim or defense, or to the extent minimally and tangentially related, far from "proportional to the needs of the case[.]"[78] For example, paralleling Requests Nos. 6 and 7, Interrogatories No. 7 and 8 could be read to request that RiverSource identify every person or outside consultant who has ever worked for its life insurance business.[79]

Interrogatories Nos. 3 and 5 seek similar information as Nos. 7 and 8, but specifically with respect to the underwriting of Mrs. Arena's policies and the denial of Mr. Arena's claim for death benefits.[80] RiverSource responded by directing Mr. Arena to documents already produced and citing to Federal Rule of Civil Procedure 33(d).[81] Mr. Arena has not raised an issue with

---

[77] Fed. R. Civ. P. 26(b)(1).

[78] *Id.*

[79] Interrogatory No. 7 asks RiverSource to "[i]dentify all persons and entities, including all of your committees or other bodies as well as outside advisors or investigators, responsible for drafting and implementing your procedures, policies, practices, rules, regulations, guidelines or standards relating to the underwriting of life insurance policies[,]" D.E. 29-2, Joint Dispute Ltr., Exhibit B, at 20), while Interrogatory No. 8 seeks the same "relating to the review of, investigation of and granting or denying death benefits claims[.]" D.E. 29-2, Joint Dispute Ltr., Exhibit B, at 21.

[80] (D.E. 29-2, Joint Dispute Ltr., Exhibit B, at 16, 18).

[81] *See supra* n. 23 and accompanying text.

15

RiverSource's production in response to Requests Nos. 4 and 5, which sought, respectively, "[a]ll documents concerning the underwriting of the Policies" and "[a]ll documents concerning your review, investigation and denial of Plaintiff's claim for death benefits under the Policies."[82] Since Mr. Arena seems to agree that RiverSource has produced all the documents related to the underwriting of Mrs. Arena's policies and the denial of Mr. Arena's claim for benefits, RiverSource is justified in invoking Rule 33(d) in response to Interrogatories Nos. 3 and 5. Furthermore, nowhere in the Joint Dispute Letter does Mr. Arena explain, as required by the Amended Scheduling Order, why RiverSource's response in this regard is deficient.[83]

Finally, the Court turns to Interrogatories Nos. 2 and 12. Interrogatory No. 2 is the same as No. 3, except that instead of seeking the identity and nature of involvement of all people "involved in the underwriting of the Policies," it seeks the same of all people involved in the "drafting, solicitation and execution of the Policies[.]"[84] As noted above, the use of the word "drafting" partially undoes the limitation provided by the defined term "Policies."[85] So, Interrogatory No. 2 essentially asks RiverSource to identify all employees, former employees, and third-party advisors who worked on any template versions of the life insurance policies which were eventually individualized for Mrs. Arena. Therefore, for the reasons discussed above with respect to Requests Nos. 6-11 and Interrogatories Nos. 7-10, Interrogatory No. 2 seeks information that is not relevant to a claim or defense or not "proportional to the needs of the case[.]"[86] Interrogatory No. 12 seeks

---

[82] (D.E. 29-2, Joint Dispute Ltr., Exhibit B, at 5).

[83] (D.E. 23, Am. Sched. Order).

[84] (D.E. 29-2, Joint Dispute Ltr., Exhibit B, at 15).

[85] *See supra* n. 73 and accompanying text.

[86] Fed. R. Civ. P. 26(b)(1).

16

similar information as Interrogatory No. 2, but with respect to any contract or agreement between RiverSource and Mrs. Arena, RiverSource and Mr. Arena, or RiverSource and both Mr. and Mrs. Arena (and not simply with respect to the Policies).[87] However, for the reasons already discussed at length in this opinion, the identities of any persons (including former and non-employees) who may have contributed to template versions of agreements later individualized to Mrs. and Mr. Arena, are not relevant to a claim or defense and certainly not "proportional to the needs of the case[.]"[88]

V. **CONCLUSION**

For the reasons discussed in this opinion, Mr. Arena's informal motion to compel is **DENIED**.

An appropriate Order follows:

**ORDER**

**IT IS** on this Tuesday, December 19, 2017,

1. **ORDERED**, that Plaintiff Arena's informal motion to compel further responses to Requests for Production Nos. 3, 6, 7, 8, 9, 10, 11, and 12 is **DENIED;** and it is further

2. **ORDERED**, that Plaintiff Arena's informal motion to compel further responses to

---

[87] (D.E. 29-2, Joint Dispute Ltr., Exhibit B, at 25).

[88] Fed. R. Civ. P. 26(b)(1).

Interrogatories Nos. 2, 3, 5, 7, 8, 9, 10 and 12 is **DENIED.**



Honorable Steve Mannion, U.S.M.J.
United States District Court,
for the District of New Jersey
phone: 973-645-3827

12/19/2017 4:45:06 PM

Original: Clerk of the Court
Hon. Jose L. Linares, U.S.D.J.
cc: All parties
    File