NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| GIANFRANCO ARENA,<br><br>Plaintiff,<br><br>v.<br><br>RIVERSOURCE LIFE INSURANCE CO.,<br><br>Defendant. | Civil Action No. 16-5063 (JLL)<br><br>**OPINION** |

**LINARES**, Chief District Judge.

This matter comes before the Court by way of Defendant RiverSource Life Insurance Co.'s Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (ECF No. 67). Plaintiff Gianfranco Arena filed opposition, and Defendant replied thereto. (ECF Nos. 68, 72). The Court decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the Court grants Defendant's Motion for Summary Judgment.

## I.  BACKGROUND[1]

Mrs. Christine Arena was a successful attorney, who had worked for Cravath, Swaine & Moore LLP as an associate and at Time Warner, Inc. as assistant general counsel. (Def.'s SMF ¶¶ 12–13; ECF No. 68-1 ¶ 1). Mrs. Arena was also the mother of four children and wife to Plaintiff. (Def.'s SMF ¶ 14; ECF No. 68-1 ¶¶ 1–2). She was "a devout Roman Catholic," and lived with

---

[1] This background is taken from the parties' statements of material facts, pursuant to Local Civil Rule 56.1. (ECF No. 67-2, Defendant's Statement of Material Facts ("Def.'s SMF"); ECF No. 68-1, Plaintiff's Response to Defendant's Statement of Material Facts and Supplemental Facts; ECF No. 72-1, Defendant's Response to Plaintiff's Supplemental Facts). To the extent that Plaintiff admits to any material facts as stated by Defendant, the Court shall cite to "Def.'s SMF" and the relevant paragraph number.

her family in Montclair, New Jersey. (Def.'s SMF ¶ 14; ECF No. 68-1 ¶ 15). In March 2015, the Arenas bought a new house and were attempting to sell their old one. (Def.'s SMF ¶¶ 15–16; ECF No. 68-1 at p. 5).

Though there is some dispute regarding the nature and timeframe of her symptoms, it is uncontested that Mrs. Arena started to experience some form of anxiety and depression beginning in at least late March 2015. (*See* Def.'s SMF ¶¶ 17–28; ECF No. 68-1 ¶¶ 50–59).[2] On April 2, 2015, Mrs. Arena and Plaintiff met with a psychiatrist named Dr. Noah Shaw, who prescribed Mrs. Arena with 25 milligrams of Zoloft once per day and 0.5 milligrams of Klonopin twice per day for her symptoms of depression and anxiety. (Def.'s SMF ¶¶ 30, 34). On April 4, 2015, Dr. Shaw instructed Mrs. Arena to take her Klonopin prescription three times per day. (Def.'s SMF ¶ 36).

On April 6, 2015, after cancelling a planned family vacation to Miami, Mrs. Arena saw a primary care physician named Dr. Laurie Nash "to rule out a medical cause for her depression." (Def.'s SMF ¶¶ 37–38). Dr. Nash observed that Mrs. Arena exhibited signs of severe anxiety and depression, which were demonstrated by multiple instances in which Mrs. Arena repeated herself and fixated on allegedly unsubstantiated concerns regarding the family's financial situation. (Def.'s SMF ¶¶ 39–40). That same day, Mrs. Arena also met with Dr. Shaw, who increased her Zoloft prescription to 50 milligrams per day. (Def.'s SMF ¶¶ 41). Dr. Shaw saw Mrs. Arena again on April 8, 2015, and noted that "[s]he was still anxious." (Def.'s SMF ¶ 42).

---

[2] There is also a dispute between the parties regarding the extent to which the Arenas' sale of their prior house and alleged financial concerns played a role in Mrs. Arena's anxiety and depression. (*Compare* Def.'s SMF ¶¶ 17–24, 30–31, 39 (claiming that Mrs. Arena's symptoms manifested after offers to sell their house had been rescinded and she expressed concerns regarding financial difficulties that her family may incur), *with* ECF No. 68-1 ¶¶ 40–45 (claiming: (i) that Mrs. Arena quickly recovered from her disappointment regarding the offers that had been rescinded; (ii) that her level of stress was normal for the situation; and (iii) that the Arenas received subsequent offers as early as April 1, 2018 and "were in the process of closing on an offer on April 21, 2015.")). However, as will be shown later in this Opinion, said dispute regarding the reasoning for Mrs. Arena's initial symptoms is not material to the resolution of this case.

2

On April 10, 2015, Mrs. Arena emailed her supervisor that she had "not been feeling well since before the Easter holiday," and that she would not be able to show up to work the following Monday. (Def.'s SMF ¶ 43). Her supervisor informed her "not to worry," and expressed significant concern over Mrs. Arena's wellbeing, even emailing Plaintiff about his concerns. (Def.'s SMF ¶ 44). On April 11, 2015, Dr. Shaw increased Mrs. Arena's Zoloft prescription to 100 milligrams per day and instructed her to increase the amount of times she took 0.5 milligrams of Klonopin to four times per day. (Def.'s SMF ¶ 45). After four days in which Mrs. Arena was described by Plaintiff as "up and down," Dr. Shaw prescribed Mrs. Arena with 50 milligrams of Trazodone once per day to be taken in addition to her other medications. (Def.'s SMF ¶¶ 49–50).

On April 19, 2015, the Arenas received an offer on their old house. (Def.'s SMF ¶ 52). While her mother happened to be visiting on April 21, 2015, Mrs. Arena allegedly became very upset because she had not included in the disclosure statement that the old house had uneven sidewalks. (Def.'s SMF ¶¶ 53, 57–59). Mrs. Arena and her mother argued, and, after Mrs. Arena supposedly calmed down, her mother suggested that Mrs. Arena rest while her mother picked up the children from school. (Def.'s SMF ¶ 60). Mrs. Arena then made several short telephone calls to Plaintiff. (Def.'s SMF ¶¶ 62–63).

After making these telephone calls, Mrs. Arena took two of her husband's belts from their bedroom and a small child's seat from her son's bedroom, and hanged herself in the bathroom. (Def.'s SMF ¶¶ 5, 64). After being discovered by her eleven year-old daughter, Mrs. Arena was taken down by her mother and rushed to the hospital, where she was placed on life support. (Def.'s SMF ¶ 6, 8). On April 29, 2015, Mrs. Arena was determined to be unresponsive, and Plaintiff decided to terminate life support. (Def.'s SMF ¶ 8). She died the following day at the age of forty-one years. (Def.'s SMF ¶¶ 8, 10). Though Plaintiff contests the characterization and legal

implication, the hospital and the New Jersey Medical Examiner both listed Mrs. Arena's death as "suicide." (Def.'s SMF ¶¶ 8–9; ECF No. 68-1 at p. 3–4).

Mrs. Arena had previously purchased two life insurance policies from Defendant on April 3 and 15, 2014. (Def.'s SMF ¶ 1). Both policies included exclusions for coverage if the insured commits suicide within two years of the date that the policies were issued ("the Suicide Exclusions"). (Def.'s SMF ¶ 2). Specifically, the life insurance policy issued on April 3, 2014 had the following provision:

> Suicide Exclusion
>
> Suicide by the Insured, whether sane or insane, within two years from the Policy Date is not covered by this policy. In this event the only amount payable by Us to the beneficiary will be the premiums which You have paid, minus any Indebtedness and partial surrenders.

(Def.'s SMF ¶ 4 (emphasis omitted)).

Similarly, the April 15, 2014 life insurance policy contained the following provision:

> Suicide Exclusion
>
> If the Insured, whether sane or insane, dies by suicide within 2 years from the Policy Date, Our liability is limited to an amount equal to the total premiums paid.

(Def.'s SMF ¶ 3 (emphasis omitted)).

On May 18, 2015, Plaintiff filed a claim for life insurance benefits from Defendant pursuant to the policies. (Def.'s SMF ¶ 67). On October 19, 2015, Defendant denied Plaintiff's claim, citing to Mrs. Arena's death certificate which listed the manner and date of death as suicide on April 30, 2015. (Def.'s SMF ¶ 68). Because Mrs. Arena's death was categorized as a suicide and occurred within two years of her taking out the life insurance policies, Defendant concluded that Plaintiff's claim was excluded by the Suicide Exclusions. (*Id.*). After Plaintiff requested

4

reconsideration, Defendant reaffirmed its denial on January 12, 2016 and again on June 20, 2016. (Def.'s SMF ¶¶ 69–72). Accordingly, Plaintiff brought this action against Defendant on July 5, 2016 in New Jersey Superior Court, Essex County, alleging breach of contract. (ECF No. 1-2). On August 18, 2016, Defendant removed the case to this Court. (ECF No. 1). Defendant now moves for summary judgment. (ECF No. 64).

## II. LEGAL STANDARD

Summary judgment is appropriate when, drawing all reasonable inferences in the non-movant's favor, there exists "no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[T]he moving party must show that the non-moving party has failed to establish one or more essential elements of its case on which the non-moving party has the burden of proof at trial." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

The Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. *See Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). If a reasonable juror could return a verdict for the non-moving party regarding material disputed factual issues, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

## III. ANALYSIS

The Court acknowledges that the facts of this case are tragic and sympathizes with the members of Mrs. Arena's family for their loss. Nevertheless, the Court must find that there is no genuine issue of material fact that would allow a reasonable juror to return a verdict for Plaintiff.

To state a claim for breach of contract under New Jersey law, a party must set forth allegations showing: (1) a contract existed between the parties; (2) a party breached the contract; (3) the breach resulted in damages; and (4) the party alleging the breach performed its obligations in accordance with the contract. *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007) (citations omitted). In the absence of any ambiguity, the meaning of a contract can be interpreted as a matter of law. *J.I. Hass Co. v. Gilbane Bldg. Co.*, 881 F.2d 89, 92 (3d Cir. 1989) (citations omitted).

Both parties agree that the life insurance policies, and specifically the Suicide Exclusions, are unambiguous and clear as written. (ECF No. 67 at 17; ECF No. 68 at 1). There also does not appear to be a dispute that Mrs. Arena's act of hanging herself caused her death. (ECF No. 67 at 2; ECF No. 68 at 2). Instead, Plaintiff argues that there is a factual question of whether or not Mrs. Arena possessed the intent required under New Jersey law to commit suicide, because Mrs. Arena's anxiety and depression medications induced an irresistible impulse to commit self-harm. (ECF No. 68 at 1). To support his argument, Plaintiff points to the fact that Mrs. Arena was religiously opposed to suicide and that an expert psychiatrist, Dr. Joseph Glenmullen, opined that Mrs. Arena's medically induced state deprived her of the ability to form the intent to take her own life. (*Id.* at 3, 27–28)

However, the unambiguous language of the life insurance policies state that her beneficiaries cannot recover if, "*whether sane or insane*," she commits suicide. (Def.'s SMF ¶¶ 3–4 (emphasis added)). This plain language, which extends to suicides committed by a claimant who is insane, indicates to the Court that the Suicide Exclusions would apply to this case even if Mrs. Arena would not have committed suicide but for the effect that the medications had on her state of mind.

This is a conclusion similar to the one reached by the Third Circuit in a case considering a nearly identical life insurance policy provision, which excepted recovery when a claimant, whether sane or insane, committed suicide within two years of entering the policy. *See Johnson v. Metro. Life Ins. Co.*, 404 F.2d 1202, 1204 (3d Cir. 1968). In *Johnson,* the claimant was a merchant marine who returned home to discover that his wife was divorcing him. *Id.* at 1203. After he was ordered by a court to keep away from his wife, the claimant spread fuel oil around his room and clothes, and proceeded to set the room, and himself, on fire. *Id.* His widow sued to recover under the life insurance policy, arguing in part "that 'suicide while insane' is a [sic] self contradictory and, therefore, meaningless phrase." *Id.* at 1204. The Third Circuit found that the life insurance policy properly encompassed suicide by an insane person, and defined same as "[sic] self destruction purposefully accomplished in accordance with an intention or design conceived by a deranged mind." *Id.* The Third Circuit then concluded that there was no evidence in the record indicating that the claimant was unaware of his actions, and affirmed the District Court's grant of summary judgment for the life insurance company defendant. *Id.*

As Plaintiff correctly indicates, (ECF No. 68 at 17), the Third Circuit in *Johnson*, 404 F.2d at 1204, stated that a material dispute of fact may exist, and a suicide exclusion may not apply, in situations where a claimant was not attempting to take his or her own life, thereby negating a finding of intentional self-destruction. However, Plaintiff misconstrues the language in *Johnson*, and a determination of the Hon. Steven C. Mannion, U.S.M.J., citing to same, (ECF No. 41 at 7–8), in concluding that there is a material dispute of fact as to whether Mrs. Arena had the intent necessary to commit suicide. Contrary to Plaintiff's claim, the *Johnson* analysis was not concerned with the claimant's intent or state of mind, but rather with the claimant's *awareness* that his or her

actions would result in death. 404 F.2d at 1204. In discussing the circumstances in which a material dispute of fact may be present, the Third Circuit stated:

> Of course a deranged person can believe that he is immortal, or that fuel oil is water, or, on some other irrational basis, that saturating his clothes with fuel oil and applying a lighted match will not kill him. Or his mental disorder may be so extreme that he has no comprehension whatever of what he is doing. Any such showing would negate intentional [sic] self destruction.

*Id.*

No such circumstance is present in this case. Identical to the plaintiff in *Johnson*, Plaintiff here has not offered any contentions or allegations "which could support a reasonable conclusion that the decedent was unaware of the fatal consequences of [her] acts." *Id.* The only factual support that Plaintiff offers is the opinion of an expert, Dr. Glenmullen, who did not observe Mrs. Arena while she was alive. (ECF No. 68 at 3, 27–28). This evidence alone is not sufficient to survive summary judgment. *See Johnson*, 404 F.2d at 1204 (upholding summary judgment where plaintiff-appellant's "only basis of judgment concerning the mental state of the insured when he killed himself is the opinion of one psychiatrist who never observed the insured."). Moreover, Plaintiff's argument that Mrs. Arena was under an irresistible impulse to take her own life actually weighs in favor of finding that her death was covered by the Suicide Exclusions. As the Third Circuit specifically considered in *Johnson*, a finding that the claimant was suffering from an irresistible impulse to commit self-harm "would affirmatively establish that [sic] self destruction was the very result intended, albeit by a deranged mind." 404 F.2d at 1204. Therefore, a reasonable juror could not find in favor of Plaintiff, and the Court concludes that Defendant is entitled to summary judgment.

## IV. **CONCLUSION**

For the aforementioned reasons, the Court hereby grants Defendant's Motion for Summary Judgment. An appropriate Order follows this Opinion.

Dated: December  /0 , 2018.

                                                            **JOSE L. LINARES**
                                                            Chief Judge, United States District Court